We'll hear argument this morning in Case 14-1418, Zubik v. Burwell and the Consolidated Cases. Mr. Clement? Thank you, Mr. Chief Justice, and may it please the Court. The Little Sisters of the Poor and their co-petitioners face a dilemma that the Religious Freedom Restoration Act does not allow. They can adhere to their religious beliefs and pay millions of dollars in penalties, or they can take steps that they believe to be religiously and morally objectionable and that the government deems necessary for them to provide contraception coverage through their health care plans. The government concedes the sincerity of these religious beliefs, but it attempts to recast them as an objection to the very act of opting out or objecting. And with all due respect, that is simply and demonstrably not true. Could you explain to me the analogy with military objectors during the war? Many of them felt that genuine belief, they were pacifists, that if they registered as pacifists, that that would mean other people would have to serve in their will. They were going to jail, and many of them did go to jail because of this belief. Why is going to jail less burdensome or less important than paying a financial penalty? Oh, I don't think it is, Justice Sotomayor, but let me stick with the conscientious objector example in the draft context, because I think the way to analyze a conscientious objector case is to say that because they face jail time, there's clearly a substantial burden. Of course, you get to the second part of the analysis, and you probably would insist on a conscientious objector actually objecting. But I think it's important to distinguish between... Let's stop there. To the extent that a conscientious objector's good faith belief is that if I register, someone will serve in my loo, what burden is it on the government? Meaning, if you're looking at it in terms of strict scrutiny, the government sends out how many notices to people to come and serve, you know, 1,000, 1,200. Do you really think it makes a difference if it knows whether or not one person is not going to show up? And if we're going down that road of what's the difference, why would that law survive? I think it would, because I think it would be very difficult to administer that kind of system if either you couldn't even know about the objection, or you couldn't take any steps on the government's part to fill a spot. But I think what's critical... Well, then isn't that the same thing here? If you don't know who can pay, or who's not eligible, or who's eligible to pay, how does this system work? Well, two things, Your Honor. One, this is perhaps the unique government program where the government can provide an exemption without actually requiring somebody to opt out, because that's exactly what they do for the churches, for the integrated auxiliaries, and the religious order. Somebody has to tell us that their church plans, have to tell the government their church plans. Somebody has to tell the government who's eligible or not eligible. How is that different than military service? Well, first of all, Your Honor, that's just not true with respect to the churches, their integrated auxiliaries, and the religious orders that stick to their knitting and only engage in religious activity. So factually, there's that distinction. But I think the more important thing, Your Honor, is I would distinguish between the fact that somebody has an objection to opting out, because the government's going to take wholly independent steps to find somebody to fill their spot, and a conscientious objector who objects to objecting on a form where the only way they can object is if they list the name of somebody else who's draft eligible, who will then be obligated to serve in their stead. I would think it's obvious. How did you begin, Mr. Clement, by saying that the government mischaracterized your position? I was just not quite sure where that argument was taking it. You're getting more into the specifics of it now. But could you just begin again there and back into what we're talking about? I would be delighted to do that, Justice Kennedy. My point was simply that my clients do not object to objecting. And part of the reason you know that is they have not been shy about objecting. They told the government in the regulatory process that they were making a mistake when they limited the true exemption for religious orders to only those religious orders that things. And my clients, the Little Sisters, couldn't qualify because they go out and they serve the elderly poor on a non-denominational basis. That's why they don't qualify for the exemption. So they objected then. They objected when they filed this lawsuit. They reaffirmed their objection when they filed the notice that was necessary to comply with this Court's interim objection. Well, Mr. Clement, that might be so, but what happens if somebody did just object to objecting? It seems as though all your arguments would apply the same way. In other words, somebody comes in and says, I do object to objecting because objecting will make it easier for the government to fill my slot. That's a perfectly understandable thing to say. And that's part of my sincere religious belief. And you say the sincere religious belief is what controls. And there too, it would seem, under your very theory, you would have to say that that's a substantial burden, even if it's just objecting to objecting. Two things, Justice Kagan. First, it would only qualify as a substantial burden if the objection requirement was enforced with massive penalties. And that's a relatively rare situation, but it's... Yes. I mean, we have the same penalties as are here, and the person is just objecting to objecting, and that's part of the religious belief, because that will make it more likely that the government will be able to fill the slot and to take efforts to provide contraceptives. I understand, Justice Kagan. That brings me to the second part of my answer, which is I think the right way to understand that hypothetical, and as I was explaining to Justice Kennedy, it's just a hypothetical. Well, it's a hypothetical that's directly implicated by your very theory of the case, because your theory of the case says that everything depends on a person coming in saying this is against my religion, and that being the end all and the be all. Well, I don't think that's our position. Our position is that the sincerity of our religious beliefs, the government can question them, they've conceded to them here, there's a legal analysis about the substantial burden, but the substantial burden analysis in this case is very clear because of these millions of dollars of penalties, the exact same penalties that were issued in Hobby Lobby, and the court said it was an easy case on substantial burden. I think you're just not answering the question. Well, I'm trying to with all due respect, which is that brings you to, if you have everything else the same, that brings you to the second part of the RFRA analysis, and I would think if our objection, contrary to fact, where we absolutely object to objecting, if you come in and the government, based on our objection, the government provides this service through the exchanges, through Title X, through an Aetna Uber policy where everybody gets their things, but if we did, I think we would lose under the second half of the RFRA analysis. Okay, so if I understand that answer, it's that if a person had a sincere religious belief that objecting to objecting was a form of complicity, then that would control, and you would have to go to the second part of the analysis, which is to say, is there a compelling interest, has the government's response been narrowly tailored? But essentially, the objecting, the difference between objecting to objecting and your client's position is not a difference at all with respect to the burden analysis. Well, I do think my client's objection is distinguishable from the hypothetical, because this is not an objecting to objecting. I mean, maybe one way to understand this is if there were, in fact, two forms, one was an opt-out form, one was an authorization form, my clients would have no objection to signing the opt-out form. They would very much have an objection to the authorization form, and the government can't just... I guess what I'm saying, Mr. Clement, is I understand the factual distinction that you're making, but the factual distinction doesn't matter, given your own legal analysis. I don't think it does, based on this Court's precedence, either, but even if I'm wrong about that, you could certainly write an opinion that says that there are three legs to the case, the fact that it wasn't an objection, the fact that it enforces it with massive penalties, and the reality that if that happens, then they're going to hijack our health plans and provide the coverage against our will. What I don't understand, Mr. Clement, is when will any government law that someone claims burdens their practice ever be insubstantial, because every believer, every believer in that's ever come before us, including the people in the military, are saying that my soul will be damned in some way. I'm not naysaying that that is a very substantial perceived personal burden by them, but if that's always going to be substantial, how will we ever have a government that functions? How will we ever have anything that the government can demand people to do in objecting? That won't be a problem. Two things, Justice Sotomayor. The first is that I do think that what you're saying about the government not being able to function under the substantial burden and then the least restrictive alternative analysis, that's exactly what Justice Scalia said for the Court in the Smith decision. And Justice O'Connor took a different view, and they had a healthy debate, and you can question who had the better of the debate, but there's no question which side of the debate Congress settled. Well, it's the side of the debate that's settled, which is if we're not asking you to do something except identify yourself, and if who's going to do the action is either the government or a third party, that that's the balance that we've struck, that it's not a substantial burden if someone else is going to do the act that you're objecting to. Justice Sotomayor, if the only action involved is a third party action, like in part of the Bowen against Roy case or in the Ling case, you're right, that's not a substantial burden. But when the government says, and it needs more, I want to be as clear as I can about this, the government admits at pages 87 through 89 of their brief that they need more just than to know that we raise our hand and opt out. They also need additional information about our insurer or our TPA. So they require more. So and if you don't... But other than who is the TPA, who is the insurer? That's all. That's what they say they need. And then they have an independent contract. The insurer or the TPA is then not dealing with the employer at all. It has an independent obligation that is imposed by the government on it and not the company. Justice Ginsburg, that's true if and only if we provide the form, because it's not just the information on the form. The government treats that form as an authorization. In the case of self-insured plans with TPA... It's not an authorization. The government, the law, the regulation requires it, but it doesn't matter whether you say yes or no. And you could say, I fill out the form, I do not authorize, I do not permit, it won't make any difference. It makes all the difference, Justice Ginsburg. If we don't provide the form, then the coverage doesn't flow. We haven't provided the form in these cases. And as a result, the coverage hasn't flowed. The government thinks, and I think it's most obvious with respect to the self-insured plans, but it's true of all of them, the government thinks it needs something from us so it can take that something and make it a plan document. Because the government has another interest at stake. One thing that you said, and I want to clear that this is not involved at all. No one doubts for a moment the sincerity of the belief of your client and all the others. And since sincerity of their belief is accepted, it's off the table any more than the sincerity of belief of the parents in the Roy case was questioned. In none of these cases is that an issue. That's accepted. But the government has acted in this case, as you know, the original self-care plan didn't provide these preventative services for women. And it saw a compelling interest there, a need that was largely ignored up until then. So as in all things, it can't be on my way. There has to be an accommodation. And that's what the government tried to do. I agree, Justice Ginsburg, but just because they call it an accommodation doesn't mean it's immune from RFRA analysis. And if what they gave my clients is what they gave the 345,000 churches, their integrated auxiliaries and the purely religious activities of religious orders, if they gave that accommodation to my client, we'd fill out any form they wanted to. But the problem is we have to fill out a form. And the consequence of us filling out that form is we will be treated very differently from those other religious employers. You started to talk about self-insured plans. Is it the case that the form or the notice to HHS in that instance becomes a plan instrument? In both cases, Your Honor, it becomes a plan instrument. And I think, you know, the government thinks that our notification in this case is the 700 form. And the reason they required a form, and this shows you it's not really an opt-out because the way the regulations were originally designed, you didn't raise your hand and tell the government, I object. You sent a form directly to the insurer or directly to the TPA that they then treated as the permission slip to provide the coverage. But that's out now. Well, no, it's not out. That's actually still one of the ways that you can apply. Yes, but you don't have to do that. You can notify the government. Well, the alternative, thanks to this Court and its interim relief, is that we now can file an objection that the government treats exactly the same way. All they do that's different is they essentially — it's a mailing rule. They take our objection, and then they provide that objection to the third-party administrator and, at least with the self-insured plans, that becomes every bit as much a planned document as the EBSA form 700. With all due respect, it's a little rich for the government to say, this isn't your plan, don't worry about this, when their whole interest is put in terms of seamless coverage. If it's seamless to the end user, then I don't think the Little Sisters' perception that it's seamless to them, and they are in fact complicit, is an irrational belief by any stretch. Is the essence of your argument that your objection is that contraceptive coverage is being done through the health insurance that you contract with? I think that's a fair description of it, Justice Kennedy, and I think the only problem the government's having understanding our position is that that health plan is somewhat intangible. And I think if you put this in more tangible terms, if the consequence of us filing the form was that they would come in to one of the Little Sisters' homes and set up shop in a room, they could pay us rent, it wouldn't cost us a thing, and then they operated a Title X clinic out of our homes, I think everyone would understand that, of course, we're complicit in the coverage that's provided on our premises. And just because this is more intangible, I don't think the principle is any different. Do we accept your client's view on complicity, or do we have a pallet graph analysis and see how far the causation goes? Do we just accept your view on complicity and then just see whether or not the accommodation is possible and it's the least restrictive? I think that's the role that your courts have had for the court, because I think they don't want to get in the role of having the truth detector test, and that's not just the Hobby or Thomas decision. If you remember that decision, you had a religious adherent who had an objection to formulating cylindrical tanks, cylindrical things that would go into tanks. Now there was another Jehovah's Witness that was in the record that said, you don't need to object to that, that's not that big a deal, it's too attenuated. And this court specifically said, we're not going to get in the business of refereeing those disputes, and we're not going to get in the business of trying to figure out and Now here you have a ton of amicus briefs that reinforce that the religious beliefs that are at issue here for the Little Sisters and for my other clients are not at all idiosyncratic, are not at all wrong as a matter of faith, but that's not an area that you should get into. Are you finished? Yeah, I am.  You must have thought about this question, I suspect. I'll assume, I want to assume, for purposes of the question, that this isn't just a matter of signing a form with an objection. Your clients are involved in the health care plan in major ways. They probably figure, sign papers every five months, or every day, and they choose insurers. They do all kinds of things. And it's the topping, the icing on the cake that pushes it over the edge, which is that you have to fill out the form saying, I object, this is my insurer. You then can contact my employees, da-da-da-da-da, it's a whole bunch of things. So the question is, putting that all together, now are they protected by RFRA? I think the reason that the court went from Sherbert and Verner over to Smith was they couldn't figure out how to apply Sherbert and Verner, and it's Sherbert and Verner that is where I'm going. And I've even read St. Benedict, you know, not for religious purposes, I'm trying to find out something about being a member of society. Sometimes when a religious person who's not a hermit or a monk is a member of society, he does have to accept all kinds of things that are just terrible for him. Think of the Quakers, the Quakers who object to Vietnam. Think of the people who object to laws protecting blasphemy. Think of the people who object to shoveling the snow in front of the walk that will lead to the abortion clinic. Think of the Christian scientists who know when they report the accident, the child will go to the hospital or the adult and receive medical care that is against their religion. So there are loads of things I've just given you four, think of the taxes, where there's no question that doesn't violate the religious clause, but plenty of other things do. So what's the line? Why do the Quakers have to pay the taxes for Vietnam, but you don't find the religious Jew or Muslim getting an extra day off during the week when the law says nobody can work on Sunday because their Sabbath is on Saturday. What is the line? And I've been reading and reading to try to find a fairly clear, simple statement of what that line is and how it works. And to repeat the difficulty of Sherbert and Verner, which is what Riffra does, quite honestly doesn't help me. But you might. I'm going to try, Justice Breyer, and then I'm going to try to reserve my time for rebuttal. So what I would say to you is you're exactly right, that Smith was a much more administrable world, but Congress is better for work. Absolutely. So here's the way that you work it and draw the line. You first ask, is there a substantial burden on religious exercise that is going to weed out some claims? If I was trying to claim that a tax on wine, for example, the Quaker, the Quaker, you think that wasn't a substantial burden? No, no, no. I'm just trying to tell you that that's one step. It will weed out some claims. I do think then there's going to be work to be done on the second half of the test. And I think there are some fairly obvious differences between a regime where essentially the government itself by its own actions has showed that people can't opt out. It's too important. It's too universal. And then you come at a case like this or like Sherbert itself. The thing that made Sherbert an easy case was the government of South Carolina had already taken care of the Sunday objectors. So at that point, their argument that the whole system would collapse if we take care of the Sabbatarians, it was not a particularly persuasive argument. Here they've taken care of the churches. They've taken care of a religious order just like the Little Sisters. If only the Little Sisters wouldn't go out and care for the elderly poor. They've demonstrated that this is an easy case. And I reserve my time. Thank you, counsel. Mr. Francesco? Mr. Chief Justice, and may it please the Court. The government here has the same interests that it has with respect to every other employee in this country who doesn't get contraceptive coverage from an employer-based plan. Yet for all of these other employees, the government tells us that it furthers its interests in other ways. The government, therefore, needs to prove that those other ways are somehow insufficient when it comes to petitioner's employees. But the sum total of their showing in this case is limited to less than one column of one page of the Federal Register. That is simply insufficient before the government can demand that organizations like Catholic Sisters of the Poor engage in conduct that all agree here they regard as sinful. Instead, what we have here is a religious employer definition, that is, those organizations that get the full-blown exemption, as opposed to organizations like the petitioners here, that gives a full-blown exemption to organizations even if they don't object to providing contraceptive coverage. That treats identical organizations differently, where you've got a Catholic school on the back and plot. Are you suggesting that once you have this category, the church, then any other organization, religiously-oriented organization, has to come within that same category as the church itself? The government can't treat the church as special and give it an exemption that it doesn't give to religious-oriented organizations. No, Your Honor. I'm not necessarily suggesting that, but in this case, when you look at what the government has, in fact, done, in particular, when you look at what Congress has, in fact, done, that is, in fact, the line that Congress has drawn, both in the Title VII exemption, where churches like the houses of worship and religious organizations like our clients get treated the same, like in the tax-exemption regime. Here the government's entire line is drawn from the tax world, where the line, where they define those who have to file informational tax returns. Yes, the government could do that, but it doesn't have to. That is, can the government say, we are going to treat the church itself ultra-protected? Religious-oriented organizations are protected, but not at that same level. Your Honor, no. I don't think they can do that in the context of this regime. I don't think the government can take the position that the Little Sisters of the Poor are any less at the core of a, quote-unquote, church than a house of worship, where we have Congress. The same with the university? Excuse me, Your Honor? The same with the university? I think with the university, yes, Your Honor, because, again, when you look at how Congress has drawn the line, universities get the Title VII exemption for religious hiring. Churches do. The Little Sisters of the Poor do. Well, but then you're answering, really, to the affirmative and to Justice Ginsburg's question. Once you give it to a church, you have to give it to any other religious organization. That's your position? Not quite, Your Honor. I think the problem is that the government has to draw a definition that is coherent and that is rational. And I think the problem here is that they've drawn a definition from the tax regime that doesn't apply when you carry it over to this regime. In the tax world, when the churches, when the universities, when the Little Sisters of the Poor file that informational tax return, they actually get the exact same exemption. It would seem to be very difficult for this Court to write an opinion which says that once you have a church organization, you have to treat a religious university the same. I just find that very difficult to write. And, Your Honor, we're not suggesting that. What we are suggesting is that when the government has the same interest here that it has for all of the other employees in this country that don't get coverage from an employer-based plan, and it's not just the religious employers, it's not just the grandfather plans. In addition, you have the self-employed, the unemployed, and the employees of small businesses. The government has the same interest with respect to all of those organizations. Your Honor, I think there was a very strong tradition in this country, which is that when it comes to religious exercise, churches are special. And that, you know, we've said this most recently in Hosein at Tabor, but it's a long line of cases which says that there's something very special about churches themselves. And if you're saying that every time Congress gives an exemption to churches and synagogues and mosques, that they have to open that up to all religious people, then the effect of that is that Congress just decides not to give an exemption at all. And that's why there are some people who are extremely strong ripper supporters who have deserted this cause right here, Professor Laycock among them, because of the mortal danger that it poses to churches. And Your Honor, just to be clear, I am not suggesting that whenever you give an exemption to churches, that exemption has to apply to all other religious organizations. What I am suggesting is that when the government has the same interest with respect to both religious and secular employees, the churches, the religious employers, the employees of small businesses, the employees of grandfather plants, and the government furthers that interest with respect to all of those employees in many other ways, whether it's the Affordable Care Act exchanges, whether it's Title X, whether it's Medicare and Medicaid, at a minimum, the government needs to explain why all of those other ways are sufficient for all of those other employees. The grandfather is traditional, there are many statutes that have grandfather provisions that are transitional. And there are many statutes that treat small enterprises differently. Are you saying that once the government makes, recognizes, exempts from the law, the small business, the very small business, once it has a number, like in Title VII, 15 employees, that's it, the floodgates open, and it has to open what is an exemption for the very small business to everyone? Not at all, Your Honor. But what I am saying is if Title VII had an exemption that said you can't discriminate on the basis of race unless you've got a pre-existing policy of racial discrimination, in which case you can maintain that policy in perpetuity as long as you don't change it, that's fine. But I think that would undermine the purpose of Title VII, and that's precisely the type of exemption that you have in the contraceptive mandate. Couldn't Congress or perhaps the executive survey the employees of churches and of other religious nonprofits and categories of religious nonprofits, the Little Sisters, a big university, and determine the percentage of employees in each of those groups who are members of the religion, and draw a distinction among those groups based on that survey? Doesn't Congress do that? Justice Alito, they could do that, and they could do many other things as well. Well, we could also just, why don't we just assume that if they are part of the, if the majority are part of the religion, that they're not going to buy contraceptives. That's their religious tenet. And so why are we worried about this case at all? Well, Your Honor, because I think... We're worried because there are some women who don't adhere to that particular religious tenet and who have, we perceive the government has determined, have a real need for contraceptives. And Justice Sotomayor, I think that goes to the larger problem with the government's case here, which is the utter absence of evidence. Let's assume for the sake of argument... What is the utter absence? There's plenty of evidence that was relied upon to show that when contraceptives are provided to women in a seamless way, that the number of unintended pregnancy dramatically falls, as does the number of abortions. And so that health risk to women who want contraceptives who can't get it is proven. Scientifically and otherwise. But Justice Sotomayor, that problem, the problem of seamlessness, or whether you call it the problem of burdensomeness, that's the problem that exists not just with respect to the employers of petitioner's employees, but with respect to every other employee who like petitioner's employees also... But you know that we exempt certain employers of certain size from Title VII. And it's not because we don't believe that racial discrimination is a bad thing. And it's not that we're not committed to eradicating that problem, but because at a certain point we have assumed as a society, or as a government, that you can't do everything. So you can't take care of the health needs of 100% of women, but you can of a significant number. Why is that a judgment that is not entitled to some respect? Because I think it means one of two things. Either the government is willing to tolerate all of the problems it identifies for petitioner's employees with respect to the employees of grandfather plans, and we understand that there are around 44 million of those, with respect to the employees of small businesses, with respect to the employees of religious employers, the unemployed and the self-employed. Either they're willing to... If they're willing to tolerate the problems with all of those people, then it really does question whether they have a compelling interest in forcing these particular petitioners to comply. But on the flip side, if, as they suggest in their briefs, they're not actually willing to tolerate the problem with respect to all of those other people, but instead think they can further their interest in other ways, the question becomes, why are all of those other ways that are sufficient for all of those other people suddenly insufficient when it comes to petitioner's employees? And that's the fundamental breakdown in the government side of the case. More generally, I think we see an absence of evidence on many of the critical issues here. Let's assume for the sake of argument we knew what the size of the problem was, how many women out there actually lack access to contraceptive coverage. And we don't know the answer to that. And let's further assume that we knew how much of that problem would be reduced by forcing organizations like petitioners to comply, would we reduce it by 1%, 15%, 50%? And we don't know that. We still don't know whether the government could achieve a comparable reduction through less burdensome means. And the very less burdensome means that it says are sufficient to further its interests with respect to all of the other employees who, like petitioner's employees, don't get contraceptive coverage from an employer-based plan. Mr. Francisco, I have to admit to not quite understanding this argument, that it seems as though the most important laws, the laws that serve the most compelling interests, are often have exceptions in them. There are often small business exceptions. There are often transition rules, like the grandfathering provision here. And if every time that existed, somebody could come in and say, well, the government must not really believe in this law because there's an exception to it. They allow some people, then, I mean, we might as well pack it all in. There's not a law in town that doesn't have exceptions like that. I don't think that's right, Your Honor. First of all, the grandfather plan is not a transition rule. It contains no sunset provision. It allows... It gets lower and lower every single year. It's got lower for the first couple of years, and it's leveled off in the last two years at about 25%. If you make any change in your health plan, then your outcome under the grandfather, and it's inevitable that over the course of years, any employer is going to make changes in the health plan. So it's a diminishing, it's a transitional period. And once you make a change in your plan, your outcome under the grandfather. Yes, Your Honor, except that they allow employees to raise copayments at the rate of medical inflation without losing status, and they allow you to continue adding employees to the plan without losing grandfathered status, which I think partly explains why it's leveled off at about 25% over the last couple of years. But even putting that aside, I think that once you've drawn a massive exemption for both secular and religious reasons, it tends to undermine, it tends to do one of two things. Either it shows your interest really isn't that compelling, because you're allowed, you're willing to tolerate a whole bunch of bad stuff for a whole bunch of other people, or, and I don't think that's really what it means here. I think what it means here is the government is telling us that it's got the same interests with respect to grandfathered employees. Here's incentives that you would put into place, Mr. Francisco. You would be saying to Congress, Congress, next time you pass a law, don't put in an exemption for churches, you're going to get in real trouble doing that. Don't write transition rules that will help people adjust to a new legal regime, you're going to get in real trouble doing that. Don't write exemptions for small businesses, even though there are very particular concerns that small businesses face, you're going to get in trouble for that. Now, those are terrible incentives to give to a legislature, are they not? No, Your Honor, I think what it means is that when the government claims an interest, the petitioners, organizations like petitioners, to violate their sincerely held religious beliefs, then yes, when it says we're going to exempt some organizations for purely secular reasons, some organizations for political reasons, and other organizations for religious reasons, then it does have a point is that let's imagine a widespread government program filled with exemptions. There are a smaller group of people who need an exemption for religious reasons. We look at those other exemptions, some seem to have good reasons, some seem to have terrible reasons. We really, under the RFRA or the First Amendment, should exempt the religious too, right? Sure, Your Honor. OK, I've just described to you the United States tax code, where we know that you do not have to have an exemption for those who are religiously objecting, for example, to paying taxes because it will support a war. Sure, Your Honor, but I think that's what I'm looking for. Same question. And I'm not asking it to refute you. I'm asking it because I'm looking for what the distinction actually is. And for the reason I just said, I don't think the distinction can be, well, you've exempted some people, so you have to exempt the religious people too, because that would run throughout the government of the United States. So what we know there is a distinction, or at least you, I believe that when you tell me there's some, I want to know what you think it is. And Justice Breyer, these are finely grained factual, factual issues. No, they're not. All right, well, go ahead. You want to say that? Yeah, but I think that when you're looking at a regime like this one that has both religious exemptions, that has large exemptions for totally non-religious reasons, and that has the exact same problem that the government claims petitioners present with respect to all of the other employees in this country who, just like petitioners, employees, don't get coverage. I've got where you're going with the exemptions, but that's not the thrust of my question. The thrust is I haven't found it yet. I want to find what the real distinction is, whether you call it RFRA or call it SNF, I don't care what you call it. I'm trying to find the basis for the distinction between those things that we do require people to do despite their religious objection and those things that we don't. And if you want to think there's no such difference, just read, as you've read, Newborn's Brief lists them all in two pages. Some go one way, some go the other way. He says, because of other people being involved, I'm not likely to answer, but what's your answer? And I'd agree that's a tough line. But I think the one I thought, what is the right? I don't think there's a clear line for what things do we require and what things we don't. Give me a hint of what the direct way the law works. I think the way the law works is it says, are you allowed to require them to do this particular thing that violates their beliefs? And in making that decision, you look at what the government, how the government is treating other similar situations. And if here, the government is in fact saying, with respect to all of these other people who also don't get the coverage from their employers, we're willing to tolerate it or else willing to address the issue in other ways, then under RFRA, the answer is you have to look to those other ways to see whether they're sufficient for these employees or whether they're uniquely insufficient for these employees. May I ask a question? Is there any accommodation that the government would offer that would in fact result in women employees of your clients or students of your clients getting health care as part of an employer-based plan or a student-based plan, getting contraceptive coverage? Is there any accommodation that would be acceptable? Your Honor, the accommodations that we've listed in our briefs would all be acceptable. No, no, no. Through, through, in other words, is there, is there any, you object to this notification. Is there any kind of notification that would be acceptable? Your Honor, if by submitting this notification or any other notification, we got the same treatment as the religious employers, then this notification would be acceptable. The religious employers, their employees do not get contraceptive coverage through the employer-based plan. I'm suggesting, I'm asking whether there's any accommodation that would result in the women employees getting contraceptive coverage seamlessly through an employer-based plan that you would find acceptable. Your Honor, possibly so, possibly not. And if I could explain, we've not been offered that kind of alternative to consider. I think the more distance you put between the petitioners on the one hand and the provision of the objectionable coverage to their employees on the other, the less problematic it is from their perspective. Well, what might be acceptable if it puts enough distance? Sure. Easily, enough distance is we file the notice of objection and the government furthers its interest in the same way it furthers its interest with respect to all of the other employees who don't get coverage from an employer-based plan. The employees of... So your answer to Justice Kagan is wrong. Basically, you're saying, even if all you do is an opt-out, I raise my hand, I tell you that I'm a religious objector, and they somehow from this suit, they know who your third-party administrator is, they have a general law that requires now all ERISA plans and insurance companies to tell them who their clients are, that if your insurer is involved in any way, you object. Not necessarily, Your Honor. Again, as Mr. Clement was saying, if there was an Uber insurance policy where Aetna was the company that the government picked to provide contraceptive coverage to all women in this country, and we happen to use Aetna, I think we'd probably be fine. Paid for by the government? Yes, Your Honor. But the problem is when... Mr. Bixton, your question was these college students, they want to get the same coverage that is available for all other conditions. As far as I understand, you're saying no, it has to be some other plan, government buys, the government provides its own plan, but as long as you connect the insurer that is insuring the religious organization, as long as that insurer is linked, it's how these students will have to get something else. They can't get what all the other students get for all other health protection. And Justice Ginsburg, I'm trying to be careful because we have many clients that have many different views, but I think as a general matter, I could certainly see the case that if they're seizing control of our plans, the plans that we are required to provide under threat of penalty, and using those plans as the vehicle to delivering the objectionable coverage to our employees solely as long as they're enrolled on those plans, which is what this does, then I could certainly see why many clients would view that as a substantial burden on their religious beliefs. That's of course not the end of the analysis. We then turn to the less restrictive alternatives and Your Honor, I'll just conclude here. It's quite clear that the government has alternatives because it's the same alternatives that it uses for everybody else. And if all of those alternatives are fine with them, they at least need evidence explaining why they're not fine for us as well. Thank you, counsel. General Reilly. Mr. Chief Justice, and may it please the court, the accommodation of petitioners challenge in this case strikes precisely the sensible balance between religious liberty and compelling governmental interests that Congress sought when it enacted. As this court recognized in Hobby Lobby, the accommodation seeks to respect the religious liberty of petitioners by exempt, exempting them from the contraceptive contraceptive requirement and to respect the interests of petitioners employees. Is it fair for me to infer from the way you open your remarks that you concede that there is a substantial burden here? And the question then is what is a permissible accommodation? What's the least restrictive alternative? Do you concede there's a substantial burden? We do not concede there's a substantial burden. Justice Kennedy, we, we concede that the religious belief is sincere. Uh, we're not questioning the sincerity of the belief, but we don't think that in a case in which the, uh, an accommodate when the question is this, when a religious objection is made to the independent arrangements of the government makes with third parties to fill a regulatory grant gap created by granting an exemption from a general, generally applicable rule, that that qualifies us as well. Do you, do you question their belief that they're complicit in the moral role? No, we do not. Well, then it seems to me that that's a substantial burden. And then the next question is whether there is an accommodation and whether that's the least restrictive. So, but I'm happy to discuss the substantial burden further, but I do want to go to what I think is the critical point on the question of how RFRA scrutiny applies if it does apply. And it's this, Mr. Francesco spent a lot of time talking about the various alternatives that the federal government has in place instead of the accommodation. And I think there's a real problem with every single one of them in that every single one of them defeats the very purpose for which Congress imposed the preventive services requirement, not just with respect to contraception, but with respect to all preventive services. And the point here, and I think you can see this, if you look at the relevant statutory provision, which you can find at page 4A of the appendix to our brief, which is the preventive services, preventive services provision. The point here of this provision is that a group health plan, i.e. the health plan that covers people through their employer or individual health insurance coverage, i.e. the kind of coverage that's sold on the exchanges shall include cost-free all of the preventive services. The whole point of this provision, the whole point of it was to ensure that people who got health insurance would get the preventive services as part of their regular care from their regular doctor. In other words, your compelling interest is not that women obtain the contraceptive services. Your compelling interest is that women obtain the contraceptive services through the insurance plan or the third party administrator hired by the petitioners hired by the little sisters. In other words, it seems to me you can't say that what you're trying to do is make sure everybody has this coverage. You want to make sure they have it through the program set up by the little sisters, and that's what they object to. Yes, I understand that, Your Honor, but assuming for the moment, and I'm happy to discuss substantial burden further, but assuming for the moment that we are in RFRA scrutiny because there is a substantial burden, the point I'm making here, and I do think this is critical, is that none of these options that the going out on the exchange and buying a separate individual policy, a contraceptive coverage only policy, Title 10, Medicare, Medicaid, with respect to every one of them, you'd have to change the law to make them even eligible here. But even if you could change the law, every single one of them creates the very problem that Congress was trying to solve in this provision because it would require setting up a one-off, jerry-rigged, separate channel to get contraceptive coverage. But the point is that it's the form in which the services are provided that you object to, not the fact that they be provided or not, because that's not the question. In other words, the petitioners use the phrase hijacking, and it seems to me that that's an accurate description of what the government wants to do. They want to use the mechanism that the little sisters, the other petitioners, have set up to provide services because they want the coverage to be seamless. Now, maybe that's a sufficiently compelling government interest, the form in which the services are provided, but the interest is not whether or not women receive contraceptive services. The petitioners do not object to the fact that the people who work for them will have these services provided. They object to having them provided through the mechanism that they have set up because they think, you know, whether you or I or anybody else thinks, they think that that complicity is sinful. I understand that, Mr. Chief Justice. I understand that that's their position. Let me engage with you on the question of whether that constitutes a substantial burden. We think that it doesn't constitute a substantial burden because the way that this accommodation is structured, although you're quite right, it seeks from the perspective of the employee to ensure that the employee gets the protection that through a separate program. But you are saying, don't worry, religions, you're not complicit. That's what you're saying. No, we're saying that judgment about complicity is up to you, but that there is an objective limit that RFRA recognizes on the scope of what is a cognizable burden, that that was true in the Brie Smith case law before RFRA. And it was, it was recognized in Ling and in Bowen, and those are cases in which there was no doubt. But it seems to me, then the analysis has to be whether or not there are less restrictive alternatives. And if, and if, if, is this the least restrictive alternative? Well, as I said, Your Honor, if RFRA scrutiny applies, then this certainly is the least restrictive alternative. Well, let me mention one of them. Suppose that it were possible for a woman who does not get contraceptive coverage under a grandfathered plan or under a plan offered by a church or under a plan offered by a religious nonprofit to obtain a contraceptive only policy free of charge on one of the exchanges. Why would that not be at least a less restrictive alternative? It has precisely the problem. It's not a less restrictive alternative because it has precisely the problem Congress is trying to overcome in the preventive services provision. What type of a burden does that impose? Is it because these, these exchanges are so unworkable, even with the help of a navigator, that a woman who wants to get free contraceptive coverage simply has to sign up for that on, on one of the exchanges? No, Your Honor. So she'll have two insurance cards instead of one. She'll have one from the employer and she'll have one from the, this plan. Just as a lot of people have one insurance card for medical services and one for prescriptions. Yes. For that vision, for the very reason that the employee has to go out and get a separate policy, even in the world that doesn't exist now, because those policies can't be sold on exchanges now. And we can talk about that in a minute, but continue with that. Even in that hypothetical world, that is not equally effective at achieving the interest, because the whole point of this provision is that you get this care from your regular doctor, as part of your regular health care, without any barriers, including any copay barriers. And I think, think about, consider this, please, from the perspective of the woman employee. She has a health plan from her employer. She goes to the, she goes to her doctor, her regular doctor. She may have a medical condition that makes pregnancy a danger for her. She may be one of the women, and this is about 15% of all prescribed contraception who needs contraception to treat a medical condition, or maybe she just wants the contraception that's appropriate for her. What happens under this, under, under a petitioner's regime is the doctor has to say to her, her regular doctor has to say to her, sorry, I can't help you. It's not just that you don't get paid the prescription paid for. It's not just that he can't write the prescription. He can't counsel or educate. Why would that be? But he would be, he would be paid under the, under the contraceptive plan because it wouldn't be her regular doctor. She'd have to go out and buy the separate plan, find a doctor who was willing to take the separate plan, assuming, assuming of course that their insurance company is willing to sell these separate. Well, you don't think that they would be willing to sell them if you subsidize them at 115%, which is what you were doing in the case of those who provide services under a self-insured plan. But the whole point here, Justice Alito, is that Congress wanted to eliminate even what were perceived by most of us as small barriers, like a five or $10 copay, because the medical experts said that even those small barriers, even when you're getting as part of your regular coverage, even those small barriers work as a sufficient disincentive that many fewer people use contraception than would otherwise. And that, and the barrier and the system that your honor is positing imposes a significantly greater barrier, even in the small, what we might see. What about the women in grandfathered plans? Well, under grant in grandfathered plans that offer no contraceptive coverage. What about that? So grandfathered plans, let's talk about them. I do, and I will answer your question directly, but I do think the broader context matters here. This is a transitional device. The number of people who are in grandfathered plans has dropped by 50%. There is no reason to think it's not going to continue to drop. And if it does continue to drop at the pace of the last four years, we'll be at zero very soon. You know, in the long run, we're all dead, but what's going to happen in the interim, what was the reason why Congress did not require contraceptive coverage right away under the grandfathered plans? It required coverage right away under the grandfathered plans for 25 year olds so that they could get coverage under their parents' health insurance plan. It would have been no great administrative difficulty for the grandfathered plans to put in contraceptive coverage, preventive care coverage right away, just as they did for the 25 year olds. And yet Congress said for the really important things like covering the 25 year old graduate student, yes, you have to do that right away. But for these other things, including what we're talking about today, you can continue to have and not to provide that coverage for women as long as you maintain your grandfathered status. Your Honor, when Congress passed the Americans with Disabilities Act, it made, it didn't impose an immediate requirement that every building be retrofitted so that access to the disabled was possible. What it said was, in that context, that where it's feasible to do so, buildings shall retrofit and then new buildings shall have these access requirements. No one would say that the government lacks a compelling interest in enforcing the Americans with Disabilities Act because Congress decided on a transitional system. This was a big program. There were reliance interests. Congress decided on transition, understood that this number was going to drop dramatically over time. You want a good place to know why it's going to drop dramatically over time. Look at the declaration from the Diocese of Pittsburgh at page 86 of the joint appendix, where they say, look, we're sticking with our grandfathered plan now because we don't want to trigger the contraceptive coverage requirement, but it's costing us a fortune. We have to change. And that's the reality. And that's why it's going to go down. And then with respect to contraception itself, Your Honor, with the grandfathered plans, as the Institute of Medicine in its study, which is in the record, said that contraceptive coverage is standard practice now. And we cited a study that said 86 percent of all plans have contraceptive coverage. So most of these women are going to have contraceptive coverage. Now, they're not going to have it cost free. And that's a difference. To come back to the point that you were making about the Americans with Disabilities Act, that certainly is a good point for the Americans with Disabilities Act. It can be very expensive to retrofit facilities to accommodate people with disabilities. But are you saying that the burden of simply instituting coverage for preventive care as it was done for coverage for 25 year olds is comparable to making architectural changes? No. But what I'm saying, Your Honor, is that this is unlike the exemption for small employees under Title 7, which exempts 17 million people from these fundamental protections against race and gender and religious discrimination and does so as a transitional device, where over time you're going to get down to a situation where virtually nobody is in the situation of being in a grandfathered plan. And most of them are getting some form of contraceptive coverage anyway. So I don't think that it undermines the compelling interest one bit. Can we go back to the substantial burden question? And I think that Justice Breyer has been talking about how to draw this line. When is it that government has to act to accommodate and when doesn't it have to act to accommodate? There's some of me guy that have suggested a line that, at least to me, helps draw some clarity to the cases, our cases, which is if what your religious belief is asking the government to do is to change its behavior with respect, its regulatory behavior with respect to others, then it can't be a substantial burden because we live in a pluralistic society in which government has to function. And hence, you're a military objector. You can't tell the government, no, you can't draft someone else. You have to you can't spend your money on war. We don't have to use you to promote the war, but if you want to use others to promote the war, you're entitled to do that as government. Does this line make any sense to you? Yes, Your Honor. Because here, what the religious groups, I understand they're asking, is the government not to use its regulatory power with third parties who don't have a religious objection and forcing a burden on the women who it's trying to help, third parties that don't have the same religious objection and burdening them to do other things. I think that is the essence of our position on substantial burden, Your Honor, and I believe in trying to answer Justice Breyer's question about where that comes from. I believe it comes from Ling and Bowen, which both recognize that there is an objective limit in Ling, for example. The court said that it did not doubt that the government actions were going to have a devastating impact on the religious exercise. This is not just a case of the government dealing with the third party based on the petitioner's objection. The objection is that the government is hijacking their process, their insurance company, their third party administrator that they have hired and set up to provide these services. I understand the distinction between, yes, you can do what you want, but you can't compel other people to take actions that are consistent with your religious beliefs. But that's not what's going on here. It is the relationship between the insurer that the Little Sisters have hired or the third party administrator with respect to other, other entities that is being used by the government to provide these services. It's not just a third party that's being compelled that they want. It's not just that they want third parties to take certain action. I would agree with you to this limited extent, Mr. Chief Justice, that that's the context in which the government action occurs here. That the fact that there is this relationship between petitioners and their But there's two points that are critical, I think, and go to why we shouldn't consider this to be a cognizable burden. And the first one is that what we are doing when we act here is trying to make an alternative arrangement that comes as close as we can to ensuring that the employees who may not share the petitioner's religious beliefs get what the law entitles them to, while at the same time, to pay for the coverage, to provide the coverage in any way. I think that the practical features of this are critical. The employer cannot be charged for the coverage. We even, insurance plan, self-insured, either way, cannot be charged. The insurance company or third party administrator has got to use separate, segregated funds. It's got to provide separate, segregated notices. In many instances, it provides a separate insurance card to the employees for this part of the coverage. So what so in that respect, it is an independent arrangement with third parties. And that we may not, they're not third parties. They're the insurance company that the petitioners have hired. It's the third party administrator that they have hired. It seems to be that the balance is pretty clear. You want the coverage for contraceptive services to be provided, I think, as you, as you said, seamlessly. You want it to be in the one insurance package. That's the, that is the compelling government interest. And on the other side, the question is whether or not people who have sincere religious objections to being complicit in that, through the hiring of the insurance company, the third party administrator, on terms where they provided, whether the government's compelling interest outweighs those sincere religious objections. Is that a fair understanding of the case? I think it is one fair understanding of the case. We think that. Is there a fairer one? Let me put it this way, Mr. Chief Justice. We would be content if the court were to conclude that with respect to substantial burden, it could assume a substantial burden, but that the government has satisfied its burden under RFRA to show a compelling interest and that this is the least restricted means of achieving. So you are giving up on the substantial burden. We're not giving up on it because we do think, but we do think the discussion this morning has suggested that this is a hard question and it is important to us. And that's why we're fighting on it and not giving up on it. Oh, so that's why that's exactly what I have found difficult. Exactly. And I read the brief. Newborn said that your brief said that we'll look to see. It's not the kind of burden that counts for purposes of RFRA or the or the First Amendment where the burden is of a certain kind. Now, what kind? And would you say, well, a kind where it arises out of the fact that we have a program that affects third parties in a big way? OK, now we have the Vietnamese. Church of the escapees in Los Angeles, we're so poor they have to meet in the basement of a house and the parking regulations stop their congregation from coming even they want to meet only on Sunday. Think about that when we can put that easily into the context of third parties being hurt so they can't practice their religion. So that when I can think of a lot of counter examples that maybe you couple that with what we have in the tax cases, administrate widespread administrative rules. The government has has leeway where third parties widespread administrative. You see, I'm I'm trying to get the thinking of the people who have thought about this, which are you and the others here on what's the best way to treat that burden? It's not hard to find in religious writing and the people when they go into society assume some burdens and they're going to find totally up. We're not urging you to state a comprehensive standard here that. Well, then what do I do? But I think I think we're urging a more incremental approach that recognizes that the principles articulated in Ling and Bowen apply in a situation where the government is acting. Making arrangements with third parties. In order to fill a regulatory gap that that has been created by the government, granting an exemption to a religious entity. Could you talk? Could you address Mr. Clement's hypothetical about where the the government would come into an unoccupied room in the Little Sisters facilities not being used for anything? They don't interfere at all. They even pay rent and they come in there and they establish a Title 10 clinic and they're distributing contraceptives on the Little Sisters property. And there's no financial burden. There's actually financial benefit to them. Is that different from the situation here? And if so, why? Yes, we think that would trigger rigorous scrutiny, be a substantial burden. The difference is that in that situation, you're actually on their premises. And in this situation, I'm trying to get back to what I was discussing with you, Mr. Chief Justice, Aetna is a different entity from petitioners. Blue Cross is a different entity from petitioners. The government makes its arrangements with Aetna or with Blue Cross, and we make arrangements with Aetna and Blue Cross and other insurance companies and TPAs to provide contraceptive coverage to other third parties, the employees. So you say in your brief, you admit in your brief that, at least in the case of the self-insured plan, the notice or the form or the notice becomes part of the plan. This is their health insurance plan established under ERISA and you are putting a new objectionable element into the plan. Isn't that correct? I don't think that's quite right, Justice Alito. I think there's been some confusion about that on the petitioner's side. There are two separate notices that operate here in the self-insured plan. The first is the notice that the employer provides to the government. That's an ERISA plan document, but the legal effect of that document is to exempt the employer from any obligation to provide contraceptive coverage. There is a second document, a different document, that the government then sends to the third party administrator. That document is the document that has a legal effect that creates the obligation on the part of the third party administrator to provide the coverage. So it is not the case that the document that comes to us is an authorizing document, that's an exempting document. But it's their plan and you admit that you are putting something into their plan that they object to on religious grounds. So the difference between that and Mr. Clement's hypothetical is that one involves something tangible, physical property, and the other involves something that's intangible. That's the distinction. Well, it's not just that it's like intangible property. The plan is really a set of rules. And the third party administrator becomes, for purposes of administering this, it becomes the plan administrator, the sole plan administrator for this portion of the plan. But even if one thought that there was, that this did create a legally sufficient reason to find a substantial burden for third party administrators, it's not true about the situation with insurance companies. It's not true about church plans. And so then it seems to me the question is whether switching from having a self insured third party administrator situation to an insurance company situation, would, whether that would be a substantial. Well, in the case of an insurance plan, isn't the insurance policy part of the plan? Isn't the insurance policy the way in which the employer provides the benefits that are available? Yes. And then, and then the government makes an arrangement with the insurance company that operates in parallel to that plan. And so, but, but, but, but it isn't through that plan. It's in parallel to that plan. So I think there's a significant difference there. But what is the government's interest in requiring, requiring compliance by Catholic charities of Pittsburgh, but totally exempting Catholic charities of Erie? So this gets to the question of the church exemption, Your Honor. And let me try to explain that. I think it's helpful to understand how it came about. The church, uh, initially HHS decided that it would create an exemption for churches, uh, and then, uh, and there was some back and forth regulatory proceedings, petitioners participated in that, um, created the exemption for churches, and then the religious nonprofits came in and said, well, the exemption ought to be extended to us. The government made a judgment that as a categorical matter, it wasn't willing to extend the exemption to all religious nonprofits as was requested, but it instead would use this accommodation, which we thought was the best way that we could put both protect their religious liberty and nature, as it's properly phrased in the briefing is the accommodation is the way in which the organizations comply with the mandate, right? With respect to Catholic charities of Erie, though, they don't have to comply through the accommodation or any other way, but are exempt. The reason we drew the line is because we think, and I think Professor Lakoff's brief is quite instructive on this point is that while there no line is perfect and I'm sure this line is imperfect and there's going to be some overlap between entities that maybe you think of look closer to being on one side of the line than the other, but the line is a valid line and it's a valid line, largely for the reasons Justice Kennedy identified earlier, because in that category of religious nonprofits, maybe some entities like the one Your Honor has identified that appear very close to entities that have an exemption, but they're also going to be lots of other entities whose connection to that core religious mission is much more attenuated. Do you have to draw the line? Is it, could you apply the same requirements you apply to the Little Sisters to the church entity itself? And so I think we could, Your Honor, yes. Under, I think under, I think we would, it would be an appropriate accommodation and I think if we had the same compelling interest and we'd make the same narrowly tailored means argument, but we have constrained ourselves. We've tried to be especially careful with houses of worship and that's a normal thing that governments do with respect to houses of worship. No, but you understand the argument. It's, and we've said this in cases like El Centro and others, that if you have a lot of exemptions, it undermines your argument that this is such a compelling interest. Right. And let me try to walk through this carefully because I do think it's important. They've identified three. First is grandfathered plans. We've had a lengthy discussion about that. I think I've tried to show you that that, I don't think you can argue that that exemption undermines the government's compelling interest. They claim that there's an exemption for employers who have fewer than 50 employees, but that's just wrong. In fact, there's no reason to think that virtually anybody in the category, in that category of employees of those small employers isn't getting contraceptive coverage as part of their regular healthcare from the regular doctors. And let me explain why that is. There is no exemption from the contraceptive coverage requirement for that group. Proof of it is that several petitioners are in that group of fewer than 50 employees and they're asking for the, and they're asking for the, and they've raised the RFRA claim here. So then that's because when employers in that group provide coverage, they have to meet the contraceptive coverage requirements so the employees get the coverage from their regular doctor as part of their regular health plan. Then also, if your employer is not providing you coverage in that group, then you go on an exchange and then you purchase a policy on the exchange and that policy provides you with contraceptive coverage as part of your regular health plan from your regular doctor, or you, you, if you are eligible, you apply for Medicaid and Medicaid gives you contraceptive coverage as part of your regular health plan from your regular doctor. For the employees who have to buy the plans on the exchange because they work for a small employer and the employer doesn't offer health insurance, does that arrangement frustrate the government's compelling interest? No, because in that circumstance, Your Honor, the only option that that employee has is to buy an individual policy on the exchange and that individual policy will contain the coverage as part of your regular health care. The difference is when somebody works for a grandfather plan, for example, in that category, or for a church, those people are already getting insurance. And so for them, it is an obstacle because you're forcing them to purchase a second insurance policy and that really becomes a financial penalty for them because part of their compensation is, of course, the health insurance they're getting from their employers. But that just underscores that the church plans here, the religious organization plans here, are in effect subsidizing the conduct that they deem immoral. So, Your Honor, I think the answer to that is that they're not subsidizing it because the way in which this plan is structured, the way in which the accommodation is structured, is that they are not, the employers are not to bear any financial burden for the contraceptive coverage that has to be provided without charging the employer. And funds have to be segregated and all activity has to be segregated. So it's quite carefully designed to avoid the existence of any subsidy with respect to that. And so we've talked about grants. I mean, if it's so easy to provide, if it's so free, why can't they just get it through another plan? Well, because then they've got to sign up for a second plan and pay for a second plan, Your Honor. And that's precisely the kind of obstacle that Congress was trying to ensure did not exist when it passed the preventive services provision of this statute. The whole idea here is to ensure that these employees get the health care, get this coverage, get this care from their regular doctor as part of their regular health care without these added obstacles. And the need to go out and sign up for another plan and find the doctors who are going to provide coverage under that plan, all of those are precisely the kinds of things that Congress was trying to do. And I think that's a good point, because all the money comes down to a question of who has to do the paperwork. If it's the employee that has to do it, that's no good. If it's the religious organization that has to do it, that's okay. I think it's a lot more than that, Your Honor. You've got to go out and find the, you've got to go out and find the separate, even if they're not on the exchanges, right? But, but, you know, put yourself in a position of this. They're not on the exchanges. So that's a falsehood. The exchanges require full service, health insurance policies with minimum coverages that are set forth, that are very comprehensive. Is that true? We're creating a new program. Is that true with respect to every policy sold on the exchanges? Yes. Every policy sold on the exchanges. And what about pediatric dentistry? Well, except for that one. Oh, except for pediatric dentistry. So you could have a separate health coverage product sold on the exchanges. You, in fact, do it already. You couldn't do it under current law, Your Honor. Well, the way constitutional objections work is you might have to change current law. And, but in this circumstance, I think you don't need to get to that question of whether there is an obligation to change current law, because even if you did have a second contraceptive only policy available on an exchange, that would be precisely the kind of barrier that Congress is trying to eliminate. You've got to have two policies instead of one policy. That creates this incentive. So a lot of the women employees, I'm certain, will reach the conclusion that, well, you know, I've got this coverage over here. No, no, I know. But I guess that substantiates the point I was trying to make, that it's a question of who does the paperwork. Well, who? You said, yes, it is a hassle to go to the exchange, although it's, you know, you've never heard about how easy it is. You go to the exchange, you get it. Or you allow your infrastructure, as Petitioners have said, to be used as the vehicle for providing it. I'm not saying it comes out one way or another from your perspective. I'm just trying to focus on exactly what is at issue. It's a question whether you want the employee to sign a paper or you want your little sisters to sign a paper. In the one case, it's an administrative burden, as you've said. In the other case, it's a violation of a basic principle of faith. No, I think that the point, Your Honor, is that the Congress and the Institute of Congress made a judgment here that this does impose a very significant obstacle. These kinds of requirements result in significantly less use of medically necessary services. And it's not it doesn't just come down to this. That's why it's necessary to hijack the plans. It's your honor. It's it is why the is why the government's interest is advanced in the least restrictive manner and the most effective. Is this right? Is it the reason I get that you don't want to have the women to have to ask for the coverage is because vast numbers of women will. Quite a few who have religious objections won't. And then there will be that middle set of people who are inertia bound. And since they are inertia bound, we can't say so what, because for people who don't object religiously, if they get the contraceptives, that lowers the cost of health coverage later on. So the government has an interest in that, and therefore there is an interest of some kind in not allowing a system, in not having a system where the inertia bound has to take initiative. Have I got that right? I think that's right. Do I have the other part right, which is this is not hijacking because there is a federal regulation that says the infrastructure of the insurers contraceptive related plan belongs to the insurer, not to the person who buys the insurance. Am I correct? That's all correct, Your Honor. And that's why when I say when we make an arrangement with Aetna or Blue Cross, we are not making an arrangement with petitioners or anything that petitioners own. Could the executive deal with the problem of what's available on the exchanges at the present time in this way? Policies are available that provide comprehensive coverage. Could the executive say as a matter of our enforcement discretion, we are not going to take any action against insurers who offer contraceptive only policies? And in fact, we are going to subsidize those insurers at 115 percent, just as we do in the situation of the self-insured plans. No, I don't believe we would have. Why would that not be that? Why would that not be a valid exercise of your enforcement discretion? I don't think it would be, but even if it were, it presents the same problem of creating the obstacle which creates the inertia problem, which undermines the compelling interest, which is not just the compelling interest of the Institute of Medicine and HHS, but of Congress itself. Because the whole point of the statutory provision here is that this is supposed to be part of your regular time. Well, I understand you're saying it would be inadequate, so why would it be not something that you could do in accordance with your understanding of executive power? Well, I don't think that it would address the problem, Justice Alito, because it would General, could you explain the difference between the employer filing a form, identifying an insurer, say Aetna or Blue Cross, that covers contraceptives for many other people that it insures, the difference between that notice and the woman who now doesn't have this coverage has to go out affirmatively and get it from someplace else. Is it just a matter of filing the form for her, or is there a real difference between an employer saying, we're not going to cover contraceptives, just our insurer's name, and the woman who suddenly doesn't have it as part of her package and has to go out and find it? I think that's exactly the point here, is that the woman employee, and I do, I'm sorry, the difference, you asked what the difference is, the difference is it's not just about filling out paperwork, that if the woman employee, you go to your regular doctor, you say you have a medical condition that puts me at risk of being pregnant, or I just want contraceptive coverage, or I need contraception to treat a medical condition, and the way this works now if the RFRA exemption is granted here, is that the doctor has to say, I cannot help you with that. That's the interest on one side of the equation. What do you understand to be the interest on the other side of the equation? I understand the interest to be avoiding complicity in what they consider to be sin. We take that very seriously. In which way does RFRA cut in analyzing that balance? I think RFRA cuts in this situation quite decisively in favor of the government here because the interests are compelling, and as we've tried to explain, none of the alternatives that the petitioners have proposed have come anywhere close to being equally effective in ensuring that women get this coverage, and the obstacles, you get told by your regular doctor, I can't help you, I can't even counsel you about this, and numerous of the petitioners have filed declarations saying that our insurance will not cover even any counseling about contraception, so you've got to go out and find another doctor, and you've got to find a way to pay for that doctor, and then you've got to find a way to pay for the contraceptive coverage. It's a whole host of very serious obstacles. It's not just about signing a form, and that gets to the heart of the problem here. Why do you assume that the doctor to whom the woman would go for other services under the plan would be unwilling to provide those services under a plan, under a separate plan that covers contraceptives? Why do you make that assumption? That would be a happenstance. Somebody's got to offer that separate plan, and that separate plan has got to, and then the doctor that she goes to as a regular doctor has to be the same, has to be under the same plan. There's no reason to think that she can't get that. General, we've used the hijack analogy has been mentioned. Can you explain why you don't see this as a hijacking? I think what we've tried to, the way I've tried to explain that, Your Honor, is that we have tried, and I think the Court recognized this in Hobby Lobby, that the goal of this is to exempt the employer from providing the contraceptive coverage, to exempt them and to provide it as separate means, through separate funds, without their involvement, and therefore it's not hijacking. What I'd like to do, if I could, I want to make one point. Maybe to follow up on your answer before you do, the contraceptive services would be provided pursuant to what plan? When you're hired by one of the religious organizations, you get a brochure or package with all your insurance coverage and, you know, everything it is, and where would the contraceptive services be listed? It won't be in that brochure. It can't be in that brochure. There's got to be a separate communication from the insurance company to the employee, telling the employee you're how it works. Mr. Francisco, I think, earlier said, if Aetna offers a separate policy, giving insurance, that he thought that that would be an adequate accommodation. And so I think that that raises all the problems I identified earlier. No, no. I meant, he says, generally, if Aetna, under some other policy, offers it on the exchange and by that policy, that's okay, if that's what they do. What's different from that from what happens here? It's basically the same thing, isn't it? Two policies instead of one. You've got to pay for that policy. Well, it is two policies instead of one, because the contraceptives are being provided by government regulation. The only seamlessness is that the woman doesn't have to apply and pay separately. Well, I think if it's a separate policy, you are going to have to apply and pay separately. It's a whole separate regime. I do want to make one point about the notice, because I know my friend on the other side raised the idea of notice, that it's not just about us using the plan, but the notice they provide. That notice argument, I think, can't constitute a substantial burden, because it's entirely derivative of the objection to us setting up this third-party arrangement. And I think Mr. Clement told you that this morning, because he said, if the government didn't take this step of providing the coverage, we would be happy to provide any information they want on a form. And so I think what that tells you is that the objection here, the locus of the objection, is the arrangement to provide the separate coverage, and not the notice per se, that on its own terms, it's an objection. Before you sit down, General Votelli, could I just ask you this informational question about this particular situation of the Little Sisters? Their regular third-party administrator also will not provide – has said it will not provide the coverage, even if they were to comply with the form of the notice requirement. And therefore, you say they probably cannot be – there's probably no way under ERISA to obtain contraceptive coverage for their employees unless you can find another third-party administrator that you could deal with there. In that situation, would the Little Sisters still be subject to fines for failing to comply? No, we don't think so. If I could, just in closing, what I'd ask this Court to do is to weigh the alternatives that have been put before you here in this case. On the one side, you've got a serious, thoughtful effort to respect petitioners' religious beliefs by creating a system that allows them to exempt themselves from the requirement in a straightforward manner and that protects the fundamental rights and liberties and dignity of their employees, many of whom may not share their religious beliefs about contraception. On the other side of the scale, what you've got is a demand that those rights of those employees who may not share petitioners' beliefs be extinguished – extinguished – until such time as Congress creates and enacts a different program that will require a separate, one-off jerry-rigged channel for them to provide and obtain contraceptive coverage that will impose precisely the burdens that Congress said in the relevant statutory provision are unacceptable for all preventive services. Well, that's one way of characterizing what's involved here, but you could also – it can also be said that – and it is true – that this is a case in which a great array of religious groups – it's not just Catholics and Baptists, it's evangelicals, but Orthodox Jews, Muslim groups, the Church of Jesus Christ of the Latter-day Saints, an Indian tribe, the Church of Lukumi Babalu Ai – have said that this presents an unprecedented threat to religious liberty in this country. What would you say to that? What I would say to that, Your Honor, is that I think essentially what eight courts of appeals have said, which is that RFRA requires a sensible balance. And a sensible balance is essential in a pluralistic society like ours, in which people of every faith on earth live and work side by side, and the government has got to administer rules that are fair to everyone. The accommodation – the accommodation achieves that balance. Petitioner's position is very, very far from that balance, and therefore the courts of appeals should be affirmed. Thank you. Thank you, counsel. Mr. Clement, four minutes. Thank you, Mr. Chief Justice. A few points in rebuttal. I'd like to start with the universities, Justice Kennedy, because I don't think it's the case that just because Congress exempts churches that it has to exempt the universities. What it needs, though, is a rationale for it. Well, under compelling interest and least restrictive alternatives, it at least has to be pretty good. And the line that they've drawn here is absurd, and I would urge you to look at the amicus brief filed by the Dominican Sisters and authored by a former head of the tax division, because it explains the line they've picked using 6033 of the tax code makes no sense. That's an informative filing requirement, but there's no substantive difference. If my clients filed the form, they get the same tax-exempt status as the churches. The only difference in that provision is whether you filed the form. The substantive treatment is exactly the same. To use that line to draw a distinction between churches and universities or the Little Sisters of the Poor is a terrible line to draw. And if you go back to— Let me talk about the line-drawing problem, and that is a brief that's been mentioned several times about this joint committee. A leading proponent of RIFRA discusses this line-drawing problem. Would you just say that's wrong? No. I would say that that gets me to the next point, but if I could just finish this point for one second. Their original justification for the line they drew, Justice Kennedy, was that the exempted organizations would be more likely to hire co-religionists and therefore less likely to have employees who would use the products. My clients equally enjoy the Title VII exemption, which gives them the right to hire co-religionists, so their original rationale applies equally to my clients. You have to draw a sensible line. Now, as to the exemptions, I mean, I will respectfully disagree with Professor Laycock, but— Churches, you've got to tell us you're going to claim an exemption, because not every church is religious, has the same religious tenets. So is that what you would have preferred? Is that the sort of incentive you want to put out there? Is that the message you're giving, which is there's lots of rules that apply differently to churches because we recognize they're special? Let me try to answer both— Others may be special like them, but it's clear to tell what a church is. Let me answer both questions together. First of all, the exemption is not just limited to churches. It applies to religious orders. And if my clients would have just stuck to their knitting and not helped the elderly poor, they could qualify. But to answer both of these questions together, not all exemptions are created equal. And Professor Laycock is a great scholar, but even he admitted he didn't understand the details of this particular plan. He didn't get into that. He left it at the parties. And I think he subsequently said that if there really was a requirement for these entities to contract, and there is, then even he would recognize there's a substantial burden. But the important point is not all exemptions are created equal. If you create an exemption for small employers, that's a rational exercise of enforcement discretion. If you create an exemption for—take the Ocentro case. If the exemption for peyote had been for a Schedule 5 substance that was less dangerous, maybe the government would have won. Their problem there was that the government had already exempted the sacramental use of provide an exemption for a different Schedule 1 substance. All of these exemptions have to be treated the same, Justice Breyer. There's no excuse. There's no other way than to do the hard work of looking at the exemptions and seeing whether they make sense. One of the cases that Congress clearly wanted to embrace in RFRA was Yoder. Now, Yoder was a relatively hard case because there basically were no exemptions. If the state of Wisconsin had already provided an exemption for the Mennonites and had already provided an exemption for the students upstate where the schools are further apart, Yoder would have been an easy, easy case. You can't make an exemption for all these grandfather plans. And please, it's not that this is a sunset provision. If you look at Joint Appendix page 956, they link the grandfather provision to the idea that if you like your plan, you can keep it. So that's not going away. Just in closing, my clients would love to be a conscientious objector, but the government insists that they be a conscientious collaborator. There is no such thing. Thank you.